## Jenkins's Estate.

*Husband and wife — Desertion — Separation—Decedents' estates—Act of June 7, 1917, P. L. 429.*

1. In order to deprive a wife of her interest in her husband's estate under the intestate laws because of desertion, the character of the desertion must have been such that under the law it would have been sufficient to entitle the husband to a decree of divorce against his wife.

2. A separation followed by a continuation of the sexual relations between husband and wife is not a malicious and wilful desertion. Under such circumstances, the fact that they lived in separate homes is of no moment.

3. Where a husband consents to his wife's going, the status is one of mutual separation and the wife cannot be charged with wilful desertion until the husband in good faith has requested her to return.

Audit of the first and final account of P. C. Fenton, executor of the last will and testament of Taliesin Jenkins. O. C. Schuylkill Co., March T., 1927, No. 34.

*James A. Dolphin,* for accountant and legatees.

*John F. Whalen* and *George Ellis,* for widow.

WILHELM, P. J., Nov. 7, 1927.—This audit came on to be heard April 26, June 7 and 13, 1927, pursuant to due notice.

From the evidence we find the following facts:

1. Taliesin Jenkins died on or about May 22, 1926, testate, married, having disposed of his estate by last will and testament. After giving directions as to the payment of his debts and funeral expenses and the care of his burial lot, the testator provided that the residue of his estate be divided into three equal parts or shares, and he bequeathed one equal part or share to his granddaughter, Christley Couch Moyer, one equal share or part to his grandson, Charles Couch, and one equal part or share to his adopted son, Stanley Jenkins.

It appears, however, that no record can be found of the legal adoption of Stanley Jenkins.

2. The account contains a principal personal property account showing a balance for distribution of $7082.77, and an income account containing a balance for distribution of $187.43.

3. The inheritance tax due the State of Pennsylvania has not been paid, and the share of the principal of Stanley Jenkins should be charged with collateral inheritance tax to the amount of 10 per cent., and the balance of principal of the estate with direct inheritance tax to the amount of 2 per

cent., and the taxes awarded to the Commonwealth are payable out of the principal account.

4. Rhoda Jenkins, widow of testator, filed her election to take against the will, and this raises the only legal question to be decided, because the legatees named in the will *allege* that Rhoda Jenkins wilfully and maliciously deserted her husband for one year and upwards previous to his death, and that, therefore, under section 6 of the Act of June 7, 1917, P. L. 429, she is barred of her right to recover any title or interest in his real or personal estate after his death.

The decedent and Rhoda Jenkins were married Aug. 7, 1913, and resided at William Penn, this county, until October, 1919, at which time they moved to Reading, Berks County, and lived in a house purchased by the testator or belonging to his wife. In December, 1919, or thereabouts, the testator returned to William Penn and remained there until March, 1920, about which time Rhoda Jenkins swore out a warrant for his arrest, charging him with non-support. After the hearing upon the non-support charge in the Court of Quarter Sessions of Berks County, the testator was discharged because it is alleged Rhoda Jenkins said at the time of the hearing "she would never come to William Penn; she would live in Reading."

In the year 1920 the testator went to Europe, and upon his return, hearing that his wife was at the home of her daughter in Shenandoah, at the suggestion of the daughter's husband, Morgan Davis, he went to the Davis home, and the greeting between the testator and the wife was friendly and affectionate. They occupied the daughter's spare bed-room for one night, and the next morning they left the home together.

Between the years 1920 and 1924, it is established that the testator visited his wife, Rhoda Jenkins, at Reading on several occasions. He took her to Atlantic City for a vacation there, and this visit appears to have occurred in 1923.

In the year 1924, the testator visited his wife on three different occasions, according to some witnesses, once in July, once in September and again in November for two weeks before Thanksgiving Day, and one witness said he was there practically all the time between July and Thanksgiving Day, 1924, after which he returned to Schuylkill County, but again returned in June, 1925, and this appears to have been his last visit, and in less than a year subsequent to his last visit the testator died at the home of his granddaughter, in this county.

The separation of this man and wife occurred in Reading in the year 1919, when he left the home they had established to return to Schuylkill County, and it does not appear that his leaving was unfriendly or the result of a quarrel or misunderstanding. There is no evidence to show that the testator was not satisfied with the wife remaining and living in Reading, but it has been established that the wife was dissatisfied with this arrangement, because the testator did not support her, as was his duty. This dissatisfaction on the part of the wife seems to have subsided, because it is established that, after his return from Europe, friendly relations were resumed, beginning with their meeting and cohabiting at Shenandoah; that when they were together, they lived as man and wife, as married people usually do, and this manner of living separate and apart, he in Schuylkill County and she in Reading, seems to have continued by mutual consent, and was an arrangement that was satisfactory to both of them.

There is no testimony subsequent to the court trial in 1920 showing that the husband ever provided a home in this county after he left Reading, or

that he invited and demanded that she live with him in the home he provided or would provide for her, but, on the other hand, he seemed to be well content with the arrangement, because none of the several witnesses ever heard this husband and wife discuss making a change in their manner of living, or heard the testator express dissatisfaction with his wife living in Reading. His residence after he left Reading was with his granddaughter, and so continued to the time of his death. If the declaration of the wife in the year 1920, in the Court of Quarter Sessions, at Reading, to the effect that she would not leave Reading, amounted to a wilful and malicious desertion, the desertion was condoned by her husband when he continued the marriage relation over the succeeding years.

A separation followed by a continuation of the sexual relation between husband and wife is not a malicious and wilful desertion. Under such circumstances, the fact that they lived in separate homes is of no moment: Arnout's Estate, 283 Pa. 49.

Where a husband consents to his wife's going, the status is one of mutual separation, and she cannot be charged with wilful desertion until he in good faith has requested her to return: Arnout's Estate, 283 Pa. 49.

The weakness of the contention on the part of the legatees is the assumption that the living apart of this husband and wife amounted to a desertion; but when consent as to the living apart is apparent, the elements of a wilful and malicious desertion are lacking.

In order to deprive a wife of her interest in her husband's estate under the intestate laws because of desertion, the character of the desertion must have been such that, under the law, it would have been sufficient to entitle the husband to a decree of divorce against his wife: Hahn v. Bealor, 132 Pa. 242; Hayes's Estate, 23 Pa. Superior Ct. 570.

The separation between the testator and his wife was due to the fact that the husband left their home, and it does not appear that he ever provided, or offered to provide, another home in which they should live. His declaration in March, 1920, in the Court of Quarter Sessions of Berks County, in his defense at her suit for support, that he would provide a home in Schuylkill County, was not an offer to her, but a matter of defense in her suit against him. He never subsequently renewed the offer or demanded that she live with him in a home he would provide; therefore, he was not in a position to successfully maintain an action for divorce against her; and if he could not establish a wilful and malicious desertion on her part in a suit for divorce, his legatees are in no better position to defeat her claim under the intestate laws.

The undisputed testimony shows that the relations between the testator and his wife were amicable and friendly and pleasant, with the exception of the one incident when she had him arrested for non-support. They greeted each other affectionately when they met in Shenandoah in 1920. In his subsequent visits to her in Reading, there is no evidence of dissatisfaction on the part of either. On the contrary, they seemed to be very companionable, going out in Reading to take meals together, attend the Fair, visited a mountain resort and sojourning at Atlantic City and Ocean City; and it appears that during these visits the testator was in a happy frame of mind; and there is no indication that he was not satisfied with their mode of living, and there does not appear to have been a single note of discord between this husband and wife after March, 1920.

In Braum's Estate, 88 Pa. Superior Ct. 109, it is said: "The mere fact that the husband and wife had been living apart was not controlling. Desertion

is an actual abandonment of matrimonial cohabitation with an intent to desert without cause or the consent of the other party. Separation is not desertion. The vice of appellant's contention is the assumption that the separation amounted to a desertion by the wife. The court below found as a fact that the separation in this case was by mutual consent and that the decedent never made any effort to induce his wife, the appellee, to resume marital relations. This finding is based upon competent evidence, and nothing appears in the case which would warrant us in disturbing it. The separation being by consent lacked the elements of a wilful and malicious desertion."

In the same Braum's Estate, on a petition for review [88 Pa. Superior Ct. 109], it appears that the affidavits recited the fact that the wife expressed a desire that she did not want to live with her husband and called him vile names, and, after she had left him, said "she did not want to live with him and did not want his money," and on the night before she left she said to her husband she was going to leave him; and in affirming the action of the lower court, upon the petition for review, the Superior Court said: "Moreover, all the allegations contained in the several affidavits submitted may be accepted as verity and still they would not show that the finding heretofore made by the Orphans' Court upon competent evidence, that the separation in this case was by mutual consent, was incorrect. Of course, if they separated by mutual consent, she was willing to leave him. She might have declared her intention; still that would not prove that the separation was not consentable. The consent was the act of both. She was willing to go and he was willing to have her go."

Horace Wink, a neighbor, testified that he saw the testator at the home of his wife in June, 1925; therefore, a full year did not lapse between the time of that visit and the date of the death of the testator. On account of the meagre testimony as to this visit in June, 1925, it cannot be said definitely that this couple had marital relations then, but it is undisputed that the connubial relations existed as late as November, 1924. Desertion cannot be charged as long as the sexual relation continues. The desertion not having occurred before November, 1924, it is impossible to say when, after that date, the desertion occurred; and if one cannot point to the time when a desertion took place, it follows that there was no desertion; and this husband and wife continued by mutual consent to live separate and apart after November, 1924, as was their mode of living before that time.

The testimony of Rhoda Jenkins, the widow, was objected to at the hearing and the objection overruled, and while it stands upon the record, it has not been considered in marshaling the facts; and the facts found are independent of any testimony of Rhoda Jenkins.

It is found, therefore, that section 6 of the Act of June 7, 1917, P. L. 429, which reads as follows, "No wife who shall have, for one year or upwards previous to the death of her husband, wilfully and maliciously deserted her husband shall have the right to claim any title or interest in his real or personal estate after his decease, under the provisions of this act," does not defeat the right of Rhoda Jenkins to participate in his estate under the intestate laws, because it does not appear that Rhoda Jenkins wilfully and maliciously deserted her husband.

5. The balance of principal in the hands of the accountant is distributable under the intestate laws to the widow, who has elected to take against the will, and under the terms of the will as to the legatees named therein, and there is awarded to Rhoda Jenkins, one-half, less tax; to Christley Couch Moyer, one-sixth, less tax; to Charles Couch, one-sixth, less tax; and to

Stanley Jenkins, one-sixth, less tax. The balance in the income account is distributable in like proportion, and of the balance of income remaining there is awarded to Rhoda Jenkins, one-half; Christley Couch Moyer, one-sixth; Charles Couch, one-sixth; Stanley Jenkins, one-sixth.

From M. M. Burke, Shenandoah, Pa.